**IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA**

MEGACAP CAPITAL, LLC, in its individual capacity and its representative capacity as General Partner of MEGACAP FUNDS, LP - SPACEX I SERIES and MEGACAP FUNDS, LP - TECH HOLDING,

Plaintiff,

v.

Case No.: 0:26-cv-61179-AHS

WEST COAST EQUITY PARTNERS II, LLC, a Delaware series limited liability company; WCEP MANAGEMENT LLC, a Delaware limited liability company; ANTON BARANCHUK, an individual; ALEXANDER LAZOVSKY, an individual; SERGEY YUSHIN an individual; and BLAYKE HALE, an individual,

Defendants,

_____________________________________________/

**DEFENDANTS WEST COAST EQUITY PARTNERS II, LLC AND WCEP MANAGEMENT LLC'S OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER**

Defendants West Coast Equity Partners II, LLC and WCEP Management LLC ("Defendants"), by and through undersigned counsel, respectfully submit this opposition to Plaintiff's Emergency Motion for Temporary Restraining Order and Preliminary Injunction [D.E. 14] (the "Motion"). In support thereof, Defendants state as follows:

## INTRODUCTION

As explained below and evidenced by the supporting documentation, the Motion should be denied, because it is based on a factual premise that is contrary to reality. Plaintiff MegaCap Capital, LLC initiated this action to evade a binding arbitration, which was previously initiated, and because

of its inability to comprehend the documents that govern its investment and the parties' relationship. Simply stated, the Motion should be denied because there is no imminent risk of injury, much less irreparable harm.

WCEP Management LLC is a Delaware limited liability company that serves as the Manager of two investment series formed under West Coast Equity Partners II LLC ("WCEP II"): (i) West Coast Equity Partners II LLC – Series Scale Up SPX 2021C (the "SpaceX Fund") and (ii) West Coast Equity Partners II LLC – Series N22 (the "Neuralink Fund"). *See* Compl. [ECF No. 1] ¶¶ 2, 5; Pl.'s Mot. for TRO [ECF No. 14] at 1. Plaintiff MegaCap Capital, LLC is a Delaware limited liability company that, acting through its affiliates MegaCap Funds, LP – SpaceX I ("MCF SpaceX") and MegaCap Funds, LP – Tech Holding ("MCF Tech") (collectively "MegaCap"), invested in both the SpaceX and Neuralink Funds as a limited partner. *See* Compl. [ECF No. 1] ¶¶ 37, 41; Pl.'s Mot. for TRO [ECF No. 14] at 3; SpaceX Subscription Agreement, **Exhibit A.**

The Neuralink and SpaceX Funds are vehicles through which the parties invested in two third party limited partnerships that purportedly owned shares in the non-public companies Space Exploration Technologies, Corp. ("SpaceX") and Neuralink Corporation ("Neuralink"), both affiliated with Elon Musk. *See* Compl. [ECF No. 1] ¶¶ 27, 38–39; Pl.'s Mot. for TRO [ECF No. 14] at 3. The thesis of the investments was to acquire an interest in two companies operated by Elon Musk while they were privately held and to reap the anticipated increase in share price once the companies went public. Beginning in February 2026, MegaCap began levying unsubstantiated allegations that Defendants committed a fraud on MegaCap by allegedly providing a doctored forward contract that misstated the share count and price per share of Neuralink shares. *See* Compl. [ECF No. 1] ¶ 65; Pl.'s Mot. for TRO [ECF No. 14] at 4–5.; Letter from Brad Kelsky to WCEP Management LLC, dated February 17, 2026, **Exhibit B.** MegaCap also began asserting that

Defendants failed to file Form D notices for MCF SpaceX or MCF Tech and that MegaCap did not receive the economic equivalent of the SpaceX shares its investment represented.

Defendants repeatedly explained to Plaintiff why its suspicion of improper activities was based on a misunderstanding of the transactional documents and relevant facts. *See* Compl. [ECF No. 1] ¶ 66; Pl.'s Mot. for TRO [ECF No. 14] at 5, 10; Letter from John Rotunno to Brad Kelsky, dated March 19, 2026, **Exhibit C.** Rather than engaging in good faith resolution efforts, MegaCap responded on March 24, 2026 asserting new and escalating theories of liability. *See* Letter from Brad Kelsky to John Rotunno, dated March 24, 2026, **Exhibit D**. With MegaCap unwilling or unable to comprehend the relevant agreements and or to understand its allegations were unfounded, Defendants initiated binding arbitration before the American Arbitration Association on April 6, 2026, as required under the parties' agreements.

Seeking to evade its contractual obligation to arbitrate, Plaintiff filed this action and subsequently moved for the Temporary restraining order related to its investment in the SpaceX Fund. MegaCap claims emergent relief is necessary because SpaceX has announced its intention to complete its initial public offering on or about June 12, 2026. MegaCap principally seeks an injunction preventing Defendants from liquidating SpaceX shares following the IPO and to refrain from diluting MegaCap by admitting new capital into the SpaceX Fund. The undisputed facts, however, establish there is no need for emergent relief for four reasons:

First, there is no imminent risk Defendants will liquidate SpaceX shares because Defendants do not own any SpaceX shares and will not own any shares immediately following the IPO. As explained to MegaCap on multiple occasions, the SpaceX Fund owns a minority limited partnership interest in a limited partnership that owns SpaceX shares. *See* Compl. [ECF No. 1] ¶ 35 & n.1 (confirming WCEP's "Signed subscription package for Class B Limited Partner in DFJ Fund IX

Continuation, L.P."); Pl.'s Mot. for TRO [ECF No. 14] at 9–10 (acknowledging the DFJ Fund IX structure). This limited Partnership is controlled by parties unaffiliated with Defendants.

Second, as detailed in the SpaceX Registration Statement in support of the IPO, all common stockholders are precluded, absent limited circumstances, from transferring or selling their shares in SpaceX for at least six (6) months following the IPO. This "Lock-Up" provision generally precludes the limited partnership from selling the SpaceX shares or transferring shares to the SpaceX Fund until November 2026 at the earliest. Even once the Lock-Up period expires, it is within the sole discretion of the third party managing the limited partnership when and whether to make any distributions and the form of any distributions (cash, stock, etc.).

Third, Defendants have not taken any steps to accept new capital into the SpaceX Fund in a manner that would dilute MegaCap's interest in the fund and by extension the limited partnership that owns the SpaceX shares. Nor do Defendants intend or plan to take any steps to accept new capital into the Fund or to dilute MegaCap. The assertion of a dilution event is rank speculation by MegaCap unsupported by any evidence or action by Defendants.

Fourth, even if one were to assume there is an imminent risk the SpaceX fund will acquire and then liquidate SpaceX shares in June of 2026 and or dilute MegaCap's position, the remedy for such actions—to the extent MegaCap theoretically could be harmed—would be money damages. Injunctive relief is unavailable where money damages are sufficient.

## RELEVANT BACKGROUND

### A. MegaCap's Investment in the SpaceX Fund

WCEP II was formed as a Delaware limited liability company on July 20, 2021. The purpose of WCEP II is to serve as the "master" limited liability company for separately formed Series. *See* Compl. [ECF No. 1] ¶ 3 (describing WCEP Master as "a master vehicle for single-asset Special

Purpose Vehicles"); Pl.'s Mot. for TRO [ECF No. 14] at 1–2. Each Series would in turn be used to admit members and to use the invested capital to acquire investments in third party entities. Specifically, WCEP II was authorized to establish, pursuant to its Operating Agreement, separate members and limited liability company interests with separate and distinct rights, powers, duties, obligations, businesses and objectives. *See* Compl. [ECF No. 1] ¶¶ 3, 5. Each Series was to be associated with a particular investment as determined by the Manager in its sole discretion. As noted above, the SpaceX Fund (Series) was formed to invest in SpaceX and the Neuralink Fund (Series) was formed to invest in Neuralink.

With regard to this action, SpaceX Fund ultimately made an investment in DFJ Fund IX Continuation, L.P. ("DFJ Fund IX"), which is a limited liability partnership established pursuant to the provisions of The Exempted Limited Partnership Act (as amended) of the Cayman Islands (the "Law") on January 24, 2007. The Limited Partnership Agreement of the DFJ Fund IX was amended and restated on February 28, 2007 and again on September 7, 2021. *See* Second Amended and Restated Exempted Limited Partnership Agreement of DFJ Fund IX Continuation, L.P. (the "DFJ Fund IX Limited Partnership Agreement"), **Exhibit E**. The primary purpose of the DFJ Fund IX is to make venture capital investments in accordance with guidelines adopted by its General Partner. *Id.* § 1.2. This included buying, selling, holding, selling short and otherwise investing in securities of every kind, including stock, notes, bonds, debentures and evidence of indebtedness. *Id.* DFJ Fund IX Continuation Partners, L.P. acts as the General Partner of DFJ Fund IX. *Id.* § 14.45. Neither DFJ Fund IX nor DFJ Fund IX Continuation Partners, L.P. is affiliated with or controlled by Defendants. *Id.* § 14.74.

DFJ Fund IX raised capital to fund investments by, in part, admitting Class B limited members. *See* Compl. [ECF No. 1] ¶ 66 n.1 (discussing Class B Limited Partner status in DFJ Fund

IX). On September 8, WCEP II (on behalf of SpaceX Fund) and DFJ Fund IX entered into an Admission Agreement pursuant to which SpaceX Fund invested $8.5 million in DFJ Fund IX and became a Class B Limited Partner (the "DFJ Investment"). *See* Compl. [ECF No. 1] ¶ 66 n.1 (quoting Rotunno's April 6, 2026 letter: "on September 8, 2021, WCEP II entered into an Admission Agreement with DFJ Fund IX, pursuant to which WCEP II invested $8.5 million and became a Class B Limited Partner"); Pl.'s Mot. for TRO [ECF No. 14] at 9–10. The Class B Limited Partnership Interest provided SpaceX Fund with an indirect interest in the portfolio investments of DFJ Fund IX, including an indirect ownership interest in shares of common stock of SpaceX. *See* DFJ Fund IX Limited Partnership Agreement, **Exhibit E**, Schedule A (listing 2,642,838 shares of SpaceX common stock). SpaceX Fund's limited partnership interest in DFJ Fund IX is subject to a 17.5% "carry" in favor of the general partner of DFJ Fund IX in the event of an exit or other gain recognition event (e.g. the sale of the SpaceX common stock held by DFJ Fund IX). *See id.* § 4.4(j)(i)(B); Compl. [ECF No. 1] ¶ 66(c) & n.1 (admitting "WCEP II's Class B limited partnership interest in DFJ Fund IX is subject to a 17.5% carried interest").

Prior to the consummation of the DFJ Investment, MegaCap expressed an interest in participating in an indirect investment in SpaceX through SpaceX Fund. MegaCap required that its investment be structured on an all-in basis with no management fee and no carry payable to SpaceX Fund or its affiliates. *See* Compl. [ECF No. 1] ¶¶ 28–31 (discussing the "$580 0/0" representation, "The Manager WILL NOT receive any commissions or fees," and "Management Fee: 0% (Zero percent)").

Based upon those discussions, SpaceX Fund prepared a confidential Private Placement Memorandum (the "PPM"), which provided that the effective purchase price for the underlying indirect interest in SpaceX common stock would not exceed $580.00 per share. On August 31, 2021,

MegaCap executed a Subscription Agreement pursuant to which it agreed to invest $375,260 in SpaceX Fund. *See* Compl. [ECF No. 1] ¶ 37; Pl's Mot. for TRO [ECF No. 14] at 3. Based on the agreed price of $580.00 per share, MegaCap thereby acquired an indirect beneficial economic interest equivalent to 647 shares of SpaceX common stock on a pre-split basis, which, following SpaceX's subsequent 1:10 stock split, became equivalent to 6,470 shares on a post split adjusted basis.

As part of its investment diligence process, MegaCap was provided with and reviewed the DFJ Fund IX Limited Partnership Agreement and related admission documents of the DFJ Fund IX. *See* SpaceX Subscription Agreement, **Exhibit A**; Compl. [ECF No. 1] ¶¶ 32–36 (describing MegaCap's diligence process, including requests to contact DFJ and receipt of documents via Docsend). Accordingly, MegaCap was informed of the material terms governing the relationship between WCEP II and DFJ Fund IX, including the economic terms applicable to the Class B limited partnership interests in the DFJ Fund IX.

In order to deliver MegaCap the agreed "all-in" economics with no management fee and no carry payable to the SpaceX Fund or its affiliates, the SpaceX Fund was allocated an internal beneficial economic interest in the relevant portion of the Class B limited partnership interest of DFJ Fund IX titled in the name of WCEP II sufficient to provide MegaCap with an indirect economic interest equivalent to 647 pre-split shares (6,470 post split adjusted shares) of SpaceX common stock, while also reserving sufficient proceeds to satisfy DFJ Fund IX's underlying carried interest. As part of its investment, MegaCap assumed all risks arising from the investment and agreed not to hold Defendants or their affiliates, managers, officers, directors, members, equity holders, employees or other applicable representatives liable for risks arising from that investment. *See* SpaceX Subscription Agreement, **Exhibit A**, §§ 2(j), 4; Private Placement Memorandum, **Exhibit F**, at 12. MegaCap warranted it had conducted its own due diligence, did not rely on Defendants in making its investment

decision, and warranted that it understood its investment was highly speculative such that it was able to bear the risk of losing its entire investment. *See* SpaceX Subscription Agreement, **Exhibit A**, §§ 2, 12.

**B. The SpaceX IPO**

In May 2026, SpaceX publicly announced its intention to commence an initial public offering in June of 2026. Thereafter, on May 20, 2026, Space X filed its S-1 Registration Statement with the SEC (the "Registration Statement"). *See* Space Exploration Technologies Corp., Registration Statement (Form S-1) (May 20, 2026), *available at* https://www.sec.gov/Archives/edgar/data/1181412/000162828026036936/spaceexplorationtechnologi.htm. The Registration Statement is a long-form registration statement required to be filed with the U.S. Securities and Exchange Commission (SEC) in connection with the IPO. It serves as the legal blueprint for the IPO, detailing a company's business model, finances, and risks before its shares can be listed on a public exchange. The Registration Statement also discusses in detail the restrictions being placed on the shares of the soon-to-be public company, such as lock-up periods precluding the sale or transfer of shares. *Id.* The Registration Statement contains a lengthy section titled "Underwriting," beginning on page 262, that details the restrictions placed on its common shares. *Id.* at 262–68.

Regarding the Space X shares owned by DFJ Fund IX, the Registration Statement explains that broadly speaking, the shares cannot be part of a sale, short sale, transfer, hedging, pledging, or other disposition for 180 days from the date of the Registration Statement. *Id.* at 265-67. Assuming the IPO does occur on June 12, DFJ Fund IX would be precluded from liquidating or transferring the SpaceX shares before November 20, 2026. *Id.* Meaning, DFJ Fund IX will not be able to make a substantial cash distribution until after the shares are liquidated and cannot transfer the Space X shares

to its Limited Partners. Even after the Lock-Up period expires, under the DFJ Fund IX Limited Partnership Agreement, the decision to liquidate, distribute shares or distribute cash to the Limited Partners lies in the sole discretion of the General Partner. *See* DFJ Fund IX Limited Partnership Agreement, **Exhibit E**, § 7.3 (certain cash distributions at General Partner's "sole and absolute discretion"); *id.* § 7.4 (discretionary cash distributions at General Partner's :discretion"); *id.* § 7.5 (discretionary in kind distributions "at the discretion of the General Partner").

## LEGAL STANDARD

It is well-settled that injunctive relief—whether in the form of a temporary restraining order or a preliminary injunction—is an extraordinary remedy that must be sparingly used and is not granted as a matter of right. *Hayes v. DeSantis*, 561 F. Supp. 3d 1187, 1196 (S.D. Fla. 2021) (citing *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010) ("an injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course")); *see also Brown v. Sec'y, U.S. Dep't of Health & Hum. Servs.*, 4 F.4th 1220, 1224 (11th Cir.) ("the grant of a preliminary injunction is 'the exception rather than the rule'"). The legal standard governing requests for a temporary restraining order and a preliminary injunction is the same.[1] *See Restivo v. Pennachio*, No. 1:21-CV-23388-JEM, 2021 WL 5361072, at *2 (S.D. Fla. Nov. 5, 2021) (standard for issuing a temporary restraining order is the same as the standard for issuing a preliminary injunction pursuant to Federal Rule of Civil Procedure 65).

[1] For ease of reference, Defendants refer to Plaintiff's request for both a temporary restraining order and a preliminary injunction as a motion for preliminary injunction. Although Plaintiff seeks both forms of relief, courts in this Circuit apply the same substantive standard to each; a temporary restraining order is typically sought on an emergency basis and, in some circumstances, without notice to the opposing party. *See* Fed. R. Civ. P. 65(b). This Court has already found that this matter does not need to be resolved on an emergency basis and can be decided after the parties have had an opportunity to fully brief this matter. *See* Order Expediting Response [D.E. 16], ¶ 4.

A preliminary injunction is "not to be granted unless the movant clearly established the 'burden of persuasion' as to the four requisites." *See Hernandez v. Stingray Grp. Inc.*, No. 24-CV-21226, 2025 WL 2263629, at *5 (S.D. Fla. Mar. 10, 2025); *DeSantis*, 561 F. Supp. at 1196. For the moving party to obtain such an extraordinary remedy, the party must demonstrate: (i) a substantial likelihood of success on the merits; (ii) irreparable injury absent an injunction; (iii) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (iv) that the injunction would not be adverse to the public interest. *Id.* at 4. Moreover, the "function of preliminary injunctive relief is to preserve the status quo pending a determination of the action on the merits." *Hernandez*, 2025 WL 2263629, at *5. Relief that goes "well beyond simply maintaining the status quo[] is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Antoine on behalf of I.A. v. School Board of Collier County*, 301 F. Supp. 3d 1195, 1202 (M.D. Fla. 2018) (citing *Powers v. Sec'y, Fla. Dep't of Corr.*, 691 F. App'x 581, 583 (11th Cir. 2017)).

## ARGUMENT

### A. Plaintiff Cannot Demonstrate Irreparable Harm

"[P]roof of irreparable harm is an indispensable prerequisite to a preliminary injunction analysis." *Siegel v. LePore*, 234 F.3d 1163, 1176, 1179 (11th Cir. 2000) (stating that "the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper"). In this case, Plaintiff cannot show irreparable harm because (1) the alleged harm is not imminent and (2) plaintiff's claim is for money damages.

#### 1. The alleged threatened injury is not imminent.

It is hornbook law that the irreparable harm required to obtain a preliminary injunction "must be neither remote nor speculative, but actual and imminent," and plaintiffs must show irreparable

harm is "likely, and not merely possible" without the requested relief. *Pliteq, Inc. v. Mostafa*, 775 F. Supp. 3d 1231, 1255 (S.D. Fla. 2025) (citing *Hoop Culture, Inc. v. GAP Inc.*, 648 F. App'x 981, 985 (11th Cir. 2016)). Here, there is no immediate, irreparable harm because no distribution can occur for at least six months and the status quo will thus stay in place for the forceable future. Plaintiff's theory of "emergency" rests on the assertion that the SpaceX IPO on June 12, 2026 will trigger an immediate and irreversible dissipation of assets. This is factually incorrect. First, Defendants do not own any SpaceX shares. The SpaceX Fund holds a minority limited partnership interest in DFJ Fund IX, and it is DFJ Fund IX (not Defendants) that holds SpaceX common stock. Defendants have no ability to unilaterally sell, transfer, or distribute SpaceX shares. Therefore, Defendants lack the power to do what Plaintiff fears. Thus, the alleged harm is not actual and imminent. In fact, the harm is factually disproven by the DFJ Fund IX governing documents and the Prospectus provided to Plaintiff.

Second, under the governing structure, the restricted SpaceX stock held cannot be sold for a period of six months following the IPO. The Registration Statement imposes a 180-day Lock-Up period during which SpaceX common stockholders (including DFJ Fund IX) are generally precluded from any sale, short sale, transfer, hedging, pledging, or other disposition of shares. Assuming the IPO proceeds on June 12, 2026, no shares can be liquidated or transferred before approximately November 2026 at the earliest. Accordingly, even after the IPO, the underlying assets will remain in place (with DFJ Fund IX) for at least half a year. The six-month Lock-Up period renders any alleged harm impossible in the near future. No distribution of IPO proceeds is imminent and no "emergency" exists.

Third, Plaintiff's allegations that irreparable harm may arise from the admission of new capital are based on rank speculation unsupported by any identified act, statement, or concrete plan by

Defendants. Plaintiff does not point to any evidence suggesting that Defendants intend to dissipate assets, alter the capital structure, or otherwise take action that could cause imminent harm. To the contrary, Defendants are not admitting any new capital into the relevant entities. The absence of any capital infusion further preserves the status quo and eliminates any plausible risk of dilution, asset diversion, or structural change.

**2. Plaintiff's claim is for money damages.**

"Economic losses alone do not justify a preliminary injunction." *See BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs.*, LLC, 425 F.3d 964, 970 (11th Cir. 2005); *White Cap, L.P. v. Heyden Enters., LLC*, No. 23-14248-CIV, 2024 WL 3738925, at *11 (S.D. Fla. July 19, 2024). "If an injury can be 'undone through monetary remedies,' it is not irreparable." *Northeastern Florida Chapter of Ass'n of General Contractors v. Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990); *FHR TB, LLC v. TB Isle Resort, LP.*, 865 F. Supp. 2d 1172, 1212-13 (S.D. Fla. 2011) (finding that the ability of plaintiff to recover money damages as an adequate remedy, even if such damage calculations were allegedly difficult, precluded finding of irreparable harm). Additionally, "[t]he possibility [that] adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Pliteq*, 775 F. Supp. 3d at 1255; *TB Isle Resort, LP.*, 865 F. Supp. 2d 1214.

Here, despite how Plaintiff characterizes its claims, the relief Plaintiff ultimately seeks is the economic value of its investment. Any damages flowing from Defendants' alleged breach are calculable and compensable through a monetary award at arbitration or trial. Plaintiff has no ownership interest in SpaceX stock, but only a right to receive proceeds ***after***: (i) DFJ Fund IX liquidates the SpaceX stock and it makes a distribution (in cash or shares) to SpaceX Fund; and (ii) SpaceX fund makes a decision to make a distribution to its members. The fact that the stock may

appreciate or depreciate in value does not transform this dispute into one involving "unique" or irreplaceable assets. This risk was clearly explained to MegaCap when making its investment and one every SpaceX Fund member agreed to assume. Any loss to Plaintiff can be quantified and remedied through an award of damages, making a preliminary injunction improper. *See Jacksonville*, 896 F.2d at 1285-86 (alleged injury was economic and compensable by money damages, and therefore not irreparable); *TB Isle Resort, LP.*, 865 F. Supp. 2d 1212-13.

**B. Plaintiff Cannot Demonstrate Success on the Merits Because Plaintiff is Getting Exactly What Was Promised**

"If the movant is unable to establish a likelihood of success on the merits, a court need not consider the remaining conditions prerequisite to injunctive relief." *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002). Here, Plaintiff's likelihood of success on the merits is undermined by the governing agreements, which Plaintiff voluntarily executed and which define the nature and scope of its investment. MegaCap was never promised direct ownership of SpaceX stock. The governing agreements all establish that MegaCap acquired an *indirect* economic interest in the SpaceX Fund, which itself holds an interest in DFJ Fund IX—a separate entity controlled by a third party. MegaCap acknowledged these terms. Additionally, the governing agreements contain comprehensive waivers and releases. MegaCap waived all rights or claims against WCEP and its affiliates arising from risks associated with its investments.

**C. The Equities and Public Interest Do Not Warrant an Injunction**

The balance of equities weighs against the extraordinary relief Plaintiff seeks. The harm to Defendants from the imposition of an injunction would far outweigh any speculative harm to Plaintiff. Plaintiff is fully protected under the parties' agreements, which provide that no material action will occur until six months after the IPO. Thus, there is no imminent injury warranting

emergency relief. In contrast, an injunction would inappropriately interfere with the parties' agreed upon contractual framework. Any order entered by this Court would either (a) merely replicate and enforce existing contractual obligations that are not within the Defendants' control, rendering such relief unnecessary and potentially confusing, or (b) deviate from the parties' governing agreements. Either outcome improperly injects the Court into matters already governed by contract and agreed dispute resolution mechanisms.

Moreover, there is an additional and independent public interest in allowing the parties' agreed upon arbitration to proceed without judicial interference. *See* Compl. [ECF No. 1] ¶ 114(q) (acknowledging "the arbitration agreements and the subscription agreements in which they are contained"); *See Nicor Int'l Corp. v. El Paso Corp.*, 318 F. Supp. 2d 1160, 1165 (S.D. Fla. 2004) (noting strong public policy in favor of arbitration); *Ballesteros v. NCL (Bahamas) Ltd.*, 925 F. Supp. 2d 1303, 1306 (S.D. Fla. 2013) ("Based on the strong federal interest in arbitration, courts, where possible, are to enforce arbitration agreements according to their terms"). The governing agreements require that this dispute be resolved through binding arbitration before the AAA in San Francisco. *See* SpaceX Subscription Agreement, § 7, **Exhibit A.** WCEP has already initiated that arbitration. Plaintiff's attempt to bypass the contractual forum and obtain emergency relief from this Court (without acknowledging the binding arbitration provisions) undermines the parties' agreement to have their contractual chosen forum resolve disputes between the parties. The equities do not justify the plaintiff using a manufactured emergency to avoid Arbitration and to have this Court interfere with the arbitration process. Put simply, there is no emergency and the equities and public interest do not warrant this Court interfering with the arbitration process.

## CONCLUSION

For the reasons stated above, this Court should deny the Motion in its entirety.

Dated: May 29, 2026

Respectfully submitted,

**K&L GATES LLP**

*/s/ Jonathan B. Morton*
Jonathan B. Morton
Florida Bar No. 956872
Jonathan.Morton@klgates.com
Southeast Financial Center
200 S. Biscayne Boulevard, Ste. 3900
Miami, FL 33131-2399
Telephone: 305-539-3300
Facsimile: 305-358-7095

*Attorney for Defendants West Coast Equity Partners II, LLC and WCEP Management LLC*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel or parties of record on this 29th day of May, 2026.

Brad E. Kelsky
Kelsky Law P.A.
150 S. Pine Island Road
Suite 300
Plantation, FL 33324
Email: bradkelsky@kelskylaw.com
*Attorney for Plaintiff*