**IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA**

Megacap CAPITAL, LLC, in its individual capacity and its representative capacity as General Partner of Megacap FUNDS, LP - SPACEX I SERIES and Megacap FUNDS, LP - TECH HOLDING,

Plaintiff,

v.

Case No.: 0:26-cv-61179-AHS$4

WEST COAST EQUITY PARTNERS II, LLC, a Delaware series limited liability company; WCEP MANAGEMENT LLC, a Delaware limited liability company; ANTON BARANCHUK, an individual; ALEXANDER LAZOVSKY, an individual; SERGEY YUSHIN an individual; and BLAYKE HALE, an individual,

Defendants,

_____/

**DECLARATION OF ELI M. BLATT**

I, ELI M. BLATT, declare as follows:

**A. Introduction and Personal Knowledge**

1. I am over 18 years of age and have personal knowledge of the contents of this declaration. If called as a witness, I could and would testify competently to the matters stated herein.

2. I am a Class A Voting Member and Manager of Megacap Capital, LLC ("Megacap" or the "Company"). I submit this declaration in my individual capacity and in my capacity as Megacap's managing member, in advance of the evidentiary hearing scheduled for June 24, 2026, and in support of the validity of the January 16, 2023 involuntary withdrawal of Marc

1

J. Goldner ("Goldner") from Megacap (the "IW"), as well as his ultimate Class B withdrawal on September 2, 2025, as detailed below.

3. Except where stated, the quotations in this declaration are reproduced verbatim from screenshots and native exports of our written communications—principally my WhatsApp message thread with Goldner and messages in Megacap's official WhatsApp channels, an iMessage group thread, and email—including all typographical errors appearing in the originals. The specific exhibit supporting each quotation, document, and corporate action is identified parenthetically below and catalogued in the accompanying Index of Exhibits.

4. The defined episode terms used in this declaration (e.g., the "Initial Threat," the "Family Threats," the "Coerced Execution") correspond to the terms used in Megacap's accompanying Memorandum of Law.

**B. Background**

5. Megacap is a Delaware limited liability company that serves as the General Partner of Megacap Funds, LP – SpaceX I, Megacap Funds, LP – Tech Holding ("MCTH"), and Megacap Funds, LP – Tech I ("MCTI"), among other special purpose vehicles (collectively, the "MCF SPVs"). Megacap is governed by its Operating Agreement (Exhibit 1, the "MC OA").

6. Goldner and I, together with Roderyck Reiter, were the three original Class A Voting Members and Managers of Megacap. Reiter voluntarily withdrew with consideration on March 24, 2022, leaving Goldner and myself as the two Class A Voting Members and Managers.

7. Separately from Megacap, Goldner and I were members of Goldner Blatt Investments, LLC ("GBI"). Through GBI, Goldner induced me to wire over $422,000, ostensibly to purchase NFTs and bitcoin miners for GBI. He instead purchased those assets into accounts and wallets that he alone controlled. By mid-2022 I had concluded that Goldner

2

had misappropriated my funds, and in July 2022 I sent him a formal demand letter (Exhibit 2, "GBI Demand Letter"). My claims arising out of that conduct are the subject of separate litigation and are referenced here only as necessary to explain the leverage Goldner held over me—-which he further "intertwined" with Megacap's affairs—during the events described below. Of note, those claims against Goldner for the injuries I sustained are not derivative in any way.

8. Megacap's creditor and limited partner, Little Prince Equity, LLC ("Little Prince"), whose principal is an individual named Jiri, held a promissory note from MCTH. Throughout late 2022 and early 2023, after I discovered Goldner's misappropriation of my funds as detailed in the Demand Letter, Goldner used threats of violence and withdrawal from Megacap to attempt to extort me into signing an interest waiver agreement ("IWA") with Little Prince on terms I believed exposed the Company to a potentially catastrophic default.

**C. December 2022: The Tax Crisis, the Initial Threat, and the Hostage Conditions**

9. On December 6, 2022, Goldner and I discovered a serious issue with the Company's 2021 tax position that, unresolved, threatened a six-figure tax bill and jeopardized the Company's ability to issue timely Schedule K-1s to its limited partners. Resolving that problem—and issuing the K-1s—became Megacap's most urgent fiduciary obligation. From one message about the tax situation to the next—and repeatedly thereafter—Goldner pivoted our WhatsApp conversation to his demand that I review and sign a "GBI Agreement" pressing me to settle the GBI Demand Letter issues on unfavorable terms, asking in the same exchange: "just tell me when ur going to review and make sure the GBI agreement is good?" (Exhibit 3). That question had no business being in the Megacap chat, let alone injected squarely into the discussion of Megacap's tax filing obligations. Nonetheless, from that point forward, Goldner refused to allow the tax matter to be dealt with on its own independent basis, instead tying it to self-interested demands at my and Megacap's expense.

10. **December 8, 2022: the "Initial Threat."** On the morning of December 8, 2022, Goldner messaged me regarding the tax matter: "Okay I've been researching it for the last day. We need to speak on the phone or on zoom. I won't be discussing this in writing as it's too complex. So find some time please." (Exhibit 4) We then spoke by video call that day. During that call, however, Goldner actually wanted to discuss the IWA. Having insisted on a medium that would leave no written record—instead of our usual WhatsApp communications—he for the first time transmitted a threat to my physical safety, allegedly on behalf of Jiri, telling me that someone would "show up at [my] door and break [my] knees" if I did not agree to the Interest Agreement.

    a.    Goldner claimed to have these threats from Jiri in writing, but he refused to share any screenshots with me. Instead, he arranged a video conference with his father, who supposedly read messages from Goldner's phone and said something along the lines of that they contained "some not so nice things."

    b.    Notwithstanding the threat, as detailed below, I refused to sign the Interest Agreement for four months until Jiri acquiesced to my terms that would protect Megacap from default, as I was unwilling to breach my fiduciary duty to the Company and endanger its ability to protect the interests of its limited partners by executing an agreement I believed could bankrupt the Company by forfeiting Megacap's ability to repay the note in shares, as Jiri wanted and Goldner was pressuring me to do..

11. **December 9–15, 2022: the "Hostage Conditions."** Over the following week, Goldner expressly conditioned the performance of Megacap business—including the tax-critical work—on resolution of his personal GBI demands. On December 9, 2022, when I told him the Tech I tax work was the priority, he responded: "I mean it's slightly important as I've fronted you over $100k." On December 11, 2022, he wrote: "I want to get this wrapped

up as I can't just keep extending your 1 year loan so you need to revise that 1 year to lower if it's not signed by EOY[1]," and, when I again asked to focus on Megacap: "The two are intertwined and you know that" (Exhibit 5).

12. On **December 16, 2022**, while Megacap urgently needed to resolve its relationship with its fund administrator, Flow, in order to complete the 2021 K-1s, Goldner conditioned his consent on my personal capitulation in the unrelated GBI dispute, writing: "I'll only agree to this and not fighting with them if u actually finish up the GBI thing we agreed to," and: "I can not commit to a new fund admin when you owe me over $100k that you have not yet agreed to repay." In a single sentence, Goldner conditioned the performance of a specific, identified Company function—securing fund administration for Megacap's limited partners—on me personally paying him one hundred thousand dollars in a wholly unrelated dispute having nothing to do with Megacap (Exhibit 6).

13. **December 27, 2022: I disengage.** After three weeks of pressing, I attempted to disengage from Goldner entirely and route our disputes into formal arbitration, writing: "Honestly Marc. Duck [sic] it."; "I'm done."; "Let's arbitrate."; "Goodbye."; and later that morning: "I will move to wind down GBI in two years and then after that I will sue you for my $." I also told him: "I want to never have to speak to you again besides the bare minimum required for MC." (Exhibit 7)

14. **December 31, 2022.** Goldner responded to my disengagement with a series of messages attacking my relationship with my then-fiancée, Emily, in deeply personal terms. In

---

[1] It is here worth clarifying Goldner's position on this alleged $100K 'debt' that he has now asserted for nearly four years. The money I wired Goldner and Compass to be used by Goldner to contribute miners to GBI as in-kind capital contributions by me were deposits. Balances due remained, and mining required monthly servicing fees. As detailed in my July 2022 Demand Letter (*See* Exhibit 2), once I discovered that Goldner had misappropriated my funds, and that he had purchased all the miners for Dharma, I refused to send more money. My Demand Letter clearly laid out that either he stole the miners or else it was GBI that owed the balances due. Either way, I personally did not. Goldner's contention, to this day, is that he is entitled to have me pay for the balances due and the servicing fee—*and to keep the miners and the mined bitcoin!*

the same message, Goldner himself proposed the use of retroactive effective dates on the parties' documents, writing: "Fortunately, I have bought you 30 days and there are legal ways for us to backdate a contract so that you can still share in the capital loss rather than us taking in a bad debt expense entirely for ourselves" (Exhibit 8). Unlike Goldner, however, I was worried about my fiduciary duty to Megacap, not minimizing my tax burden.

**D.  January 2023: Escalation and the Involuntary Withdrawal**

15. **January 6, 2023: the redemption threat.** Goldner threatened to remove me from our ventures, writing: "You have effectively put 0 hours into BitSource, nft fund, gbi, dharma, and Neuralverse in 6+ months which is a forbidden act and is redeemable" (Exhibit 9).

16. **January 12, 2023.** In an effort to insulate myself from Goldner's real-time hostility while still discharging my duties, I asked him to move all business communication to email: "Going forward please email me with any MC or other business thx." Goldner refused: "RE communicating via email. That isn't reasonable nor something I'll agree to." Despite that, desperate to get Goldner to allow Megacap to file taxes, I continued to engage him. But Goldner continued pressuring me to file inaccurate and likely fraudulent tax returns for the Company not showing the Company's MCTI management fees as having been earned in full upon receipt in order to reduce his own tax liability.

    a. To rationalize his position, he wrote: "The management fee shouldn't be 5% up front, the 5% is held in trust" on December 12, 2022 in the WhatsApp Channel. However, I had consulted with Megacap's fund administrator, legal counsel, and accountants, all of whom had confirmed that the MCTI governing documents had the General Partner earning its management fees upon each LP's closing. And, as a practical matter, the Company distributed the management fees. But Goldner didn't care. He insisted that he would not allow taxes to be filed that showed the Company had earned the management

fees, as he wanted to reduce his own pass-through tax liability—even if it meant filing fraudulent returns that disadvantaged the Limited Partners by reducing their tax write-offs and increasing MCTI's tax preparation fees (Exhibit 10).

17. **January 13, 2023: the "First Withdrawal Threat."** In an official Megacap WhatsApp channel that included Megacap limited partner and creditor Little Prince and other limited partners, Goldner, frustrated at his failure to extract my signature for the IWA, threatened me with unilateral withdrawal: "Honestly Eli? I'm sick and tired of your forbidden acts. *I will vote to have you involuntarily removed*" (emphasis added, Exhibit 11).

18. **January 16–17, 2023: the Involuntary Withdrawal.** Goldner was plainly stating his intention to withdraw me—a course of action that, as the MC OA was structured, he could pursue unilaterally just as I could. Had he done so, Megacap and its limited partners would have been left at the mercy of his increasingly erratic and self-serving conduct while I litigated my way back in. Accordingly, having already had unequivocal cause that I had not exercised, I drafted a formal Company consent for Goldner's involuntary withdrawal with an effective date of January 16, 2023, and executed it via electronic signature on January 17, 2023 (Exhibit 12).

19. Immediately upon drafting the IW on January 16, 2023, I emailed Megacap's then-counsel, writing:

> Things with Marc have been going dramatically downhill. I'm concerned he may try to spuriously involuntarily withdraw me from Megacap, and **I have a fiduciary duty to the Company and our LPs to not leave him solely in control**. **He also has been preventing us from filing our taxes, which I suspect he is doing to pressure me on the miner/NFT issue**. Sending this just for the record to confirm the effective date as accurate in the event he later tries to withdraw me. As of now, he is withdrawn (emphasis added, Exhibit 13).

20. That same day, January 16, 2023, I documented the threats contemporaneously in Megacap's channel, stating once again my request that he limit his communications to me to

7

email, writing: "Since Marc has made threats to me and Emily, I have every right to not subject myself to realtime hostility from him" (Exhibit 14).

21. The MC OA does not require notice of withdrawal to a Member; it requires notice only in the event of redemption or the purchase of the withdrawn member's interests by other members. As my withdrawal of Goldner was not financially motivated, I did not redeem him at that time. My only goal was to ensure proper, ethical, and legal management of the Company and to insure Megacap against Goldner's threatened withdrawal of me—without triggering him to escalate dramatically. I was, candidly, afraid of what might happen were I to give him notice of his withdrawal.

22. **January 26–27, 2023: the "Family Threats."** Having failed to pressure me into signing the Interest Agreement by transmitting threats against me, Goldner expanded his campaign of terror to include my mother. In iMessage group messages on January 26–27, 2023  that included me and my mother, Goldner tried to ascertain my physical location, causing me to fear for my safety; transmitted threats to my "safety"; claimed there was a "safety risk"; stated that I was putting my "family's lives at risk"; tied the danger to the execution of documents, writing "We arent signing anything [referring to the tax filings] until the CP document is done"; and wrote: "I don't think you understand what they will do to us. Do you think this is some kind of fucking game?" (Exhibit 15).

23. I responded contemporaneously: "I will not stand for any more of these threats to my safety. If you persist, you will force me to file a restraining order against you, because you are legitimately giving me cause to fear for my safety" (*Id*.). I did later file a restraining order against Goldner, but was never able to effect service upon him given his active evasion.

24. **January 31, 2023: the "Lockstep Execution Demand."** Goldner demanded an in-person meeting and the consecutive execution of an entire document package—the so-called "**Megacap "Resolutions**"—writing: "We need to meet in person if you don't want

to that's on you. I'll get you my draft of the option and loan agreement soon but I have no choice but to demand all documents are signed consecutively" (Exhibit 16).

25. In that same exchange, I clearly articulated my position on key issues:

> You will never know where I am ever again. I'm even going to skip Module 7 [of our MBA program] so I don't have to be around you.

> You are not considering the worst case outcome [with the proposed IW]. I don't really think it's a good deal for us, as I'm more concerned with limiting downside… There is a version of it where I feel better about it… I'm availble by email and 1000% committed to meeting all of Megacap's fiduciary duties.

> The two issues [GBI Agreement re NFTs/Miners and the Megacap issues] are totally unrelated, plus you're of course adding all sorts of terms that benefit you. I'm not going to be extorted by you. I'm also not going to be unnecessarily obstinate. I will absolutely work with everyone to try and come to mutually agreeable resolution for everyone. But I'm not cool with exposing us to $250K+ in debt [by way of the IWA] that we could default on. You threatening my safety won't change that or my primary obligation to issue K1s and file on time. If we fail to issue these K1s, we potentially open ourselves up to lawsuits and requests for redemptions. It's our single biggest fiduciary duty and liability, and your insistence in tangling all this shit together is exposing us to substantial legal risk (See Exhibit 16).

26. Faced with my well-reasoned and fiduciary-aligned objections, Goldner threatened my removal—"What you're doing you will be removed for"—and invoked the threat of violence yet again, in writing this time: "What do you think they're going to do to US if we repay in shares?" and "So you're going to be risking both of our lives over not trying to sell?" Immediately after that barrage, he demanded to know my physical whereabouts: "Eli. Where are you right now? Care to share?" (Exhibit 17).

**E.   February 1–13, 2023: The Coerced Execution of the 2023 Resolutions**

27. **February 1, 2023: the "Bankruptcy Threats."** At 2:06 a.m., I again refused to be coerced, writing: "I will not be extorted into to giving you concessions under threat of you sinking Megacap." [sic]. Goldner escalated within minutes: "Bro if you think I'm not suing all of you (Celina, Emily, etc.) if you're going to not be paying me you have another thing coming. You're about to enter one of the longest most complex litigations of your life for your refusal to pay the balance of miners and you're going to lose and spend thousands of

hours and hundreds of thousands of dollars on legal fees… I will expose and completely bankrupt you in court for your fraud… Hug Em for me" (Exhibit 18).

28. **February 3, 2023.** As Goldner forced his terms into the documents, I continued to resist their substance in real time, writing: "Marc I cannot enter into a transaction I don't understand… No I'm not doing that" (Exhibit 19), having previously told him "I will not be stuck owning those shares myself" with no ability to sell them (See Exhibit 16).

29. **February 7, 2023: the "Simultaneous-Execution Ultimatum."** Goldner refused to permit the tax-critical instruments to be executed on their own without forcing me to agree to add all manner of concessions to him at the expense of the Company, including his insistence on distributing out Tech Holding interests to us individually that the Company could use to earn fees on. At 8:15 a.m. he wrote: "We must execute it simultaneously," and again that afternoon: "they all need to be executed simultaneously." He simultaneously conditioned his signature on new, non-negotiable terms of personal benefit to him: "We NEED to be able to assign our interests to ANYONE we want and it is CONFIDENTIAL. otherwise we can not sign this" (Exhibit 20).

30. My contemporaneous messages document my state of mind under this pressure. Reviewing Goldner's edits to the very instruments whose validity he now invokes, I wrote that I was "having a fucking panic attack" just reading them, and directed him in capital letters to "NOT ADD ANY NEW VERBAL DIARRHEA TO ANY OF THE DOCS" or "THIS WILL NEVER GET DONE." I just wanted to be able to file taxes end the abuse; despite my duress, however, I held my wits about me enough to ensure that, if somehow the agreement ever were deemed to be valid or enforceable, it actually effectuated nothing (See further Exhibit 20).

31. **The tax clock.** The Company's 2021 Schedule K-1s were urgently due to its limited partners, which Goldner used as a pressure point, as Flow, the fund administrator, would not

prepare and issue the K-1s until it received the executed amendment and amended series agreement, which he was blocking by way of his demand for synchronous execution with the Resolutions. I told Goldner on February 9, 2023: "let's get them signed i want to send to Ryan executed amendment and amended series ASAP"—"it's critical" (Exhibit 21).

32. **February 9–10, 2023.** Goldner assembled the documents into two electronic signing packages: the first containing the 2023 Resolution, and the second containing the Tech I Amended Series Agreement and Amendment Flow required for the K-1s.

33. While I had resisted Goldner's pressure and threats regarding signing the IW, holding out for Jiri to acquiesce to repayment of the note in shares rather than default (which he eventually did), I felt the Company could suffer potentially irreparable fallout from both the IRS and our limited partners if we failed to timely file. I did not have a fiduciary duty to sign the IWA. I did have a fiduciary duty to ensure Megacap honored its obligations to the IRS and remain in good standing with our limited partners. Accordingly, I felt I had no choice but to sign both packages, and so I signed the Series Amendment on February 10, 2023.

34. **February 13, 2023: the "Coerced Execution."** Two days before the K-1 deadline—Goldner pressed for immediate execution of the Resolutions, conditioning his signature on the Series Amendment I had signed 3 days prior on my execution of the Resolutions: "if u have 30 mins now get the hellosign signed." At 10:33 a.m. I wrote "signed." Goldner responded: "Boom! Signed as well on my end! On to the next one...let's go! Good shit!" The so-called Megacap Resolutions (the "2023 Resolutions" or the "Resolutions") were thereby executed.

35. At the time of execution, I reasonably believed I had no adequate alternative: the K-1s were a legal obligation owed to Megacap's limited partners on a fixed deadline; Flow would not proceed without the executed instruments; Goldner refused to allow the tax-critical instruments to be executed except simultaneously with the Resolutions; and Goldner had

spent the preceding ten weeks demonstrating—through the Initial Threat, the Family Threats, the location demands, and the removal threats—that his threats were to be taken seriously. I did however manage to ensure that, even if they were found to be valid despite Goldner's lack of Class A Membership and the duress I was under, the Resolutions would not, in fact, cause any damage to the Company.

36. **The Resolutions were wholly executory.** The 2023 Resolutions consist of prospective "resolved," "shall," and "will" provisions contemplating a framework of options, assignments, and a possible loan structure. In practice, nothing was ever performed under them: no money, equity, or property changed hands pursuant to the Resolutions; no option was exercised; no assignment was made; and no filing was made in reliance upon them before their rescission.

**F.   March – May 2023: Continuing Threats, Rescission, and the Amended Withdrawal**

37. Execution of the Resolutions bought me no peace. On March 13, 2023, when I told Goldner that I would not operate the Company out of fear, he responded: "You can get fucked to hell brotha. You won't get any signatures from me," and later that morning: "I know my life was threatened... If I'm told someone will knock on my door I can't be expected to join your united front." (Exhibit 23).

    a.   Note that per his own Exhibit 19 to his Counterclaim, a screenshot from which is included with Exhibit 23, Goldner *himself* is actually the one that came up with the "break your legs or kill you" threat he transmitted to me, to which Thibaut—who after the fact he is accusing of making the threat (after saying in all his messages to me that it was Jiri)—replied point blank: "This needs to be sorted as this Eli has no direct relationship with us… I believe you have the power to sort this out… And it will be beneficial for all of us."

b.  This exchange makes it clear that (i) Goldner imagined the threats and (ii) I was specifically excluded as a perceived responsible party to Little Prince.

38. On March 18, 2023, in connection with the interest waiver agreement Goldner was pressing me to send to Little Prince, I expressly reserved my position in writing: "I will also state for the record here that I am only entering into this agreement under duress, which you have conveyed to me as well... I therefore consider the agreement to be invalid." Goldner's response was: "That's fine I'm in the same position as u." That same day he threatened: "In that time you'll be redeemed from every business so don't threaten me broski" (Exhibit 24).

39. In a March 19, 2023 email I wrote: "I cannot and will not continue working under the current environment of constant, near daily threats against me." Goldner replied on March 23, 2023: "I do not give a flying fuck" (Exhibit 25).

40. Exchanges such as these prompted me to write Megacap's counsel on April 3–4, 2023, via text messages:

> When I see am [sic] email come in from him **my heart rate spikes**. He has **waged a campaign of terror against me**. I'd like immediately consult on whether I have grounds to **file a restraining order**... Marc has **ruined my life for a year now**... **I've developed an anxiety disorder basically because of him**... **I'm having a nervous breakdown.**... **I'm past my limit** and [I] do not know what to do... **Somewhere Marc is laughing**... At a certain point it's just all too much. Losing my money. Losing my home. Multiple court cases. More theft from me. **Unceasing psychological warfare against me** (emphasis added, Exhibit 26).

41. **April 8, 2023: "Goldner's Resolutions Admission."** In an April 8, 2023 email threatening to withdraw me notwithstanding the Resolutions, Goldner wrote: "Eli, I want to explain that our resolution signed for Megacap states, 'that any such attempted removal shall be void upon completion of the terms of this resolution.' *The terms haven't been completed*... Redemption is not off the table" (Exhibit 27, emphasis in the original).

42. **April 18, 2023: the "Second Withdrawal Threat" and the "Google Drive Blackmail."** In yet another attempt to extort my acquiescence, Goldner again threatened to

13

withdraw me, writing: "If you do not respond I will be serving you notice of your redemption." In the same email exchange, Goldner admitted in writing that he had accessed my Google Drive, made copies of confidential litigation files, and threatened to disclose those files to opposing parties in my active litigation unless I capitulated, writing to my assistant, who was copied on the threat: "I would assume the K4B.zip (K4B Litigation-20211208T040808Z-001.zip) that he sent me is also 'not confidential information' and that he has no problem with me contacting Craig, Flash, and all other parties to get their perspective on how Eli's behavior is clearly be repeated now with me" (Exhibit 28).

43. That was the final straw for me. I had held off taking action to recover the assets Goldner had stolen from me for fear it would trigger Goldner to become even more unhinged, but after the Google Drive Blackmail, I realized there was no hope of a productive working relationship with him, and so shortly thereafter I served him a GBI rescission notice and civil theft demand—in part hoping that formal litigation would force Goldner to stand down from his campaign of terror.

44. **April 28, 2023.** I drafted a consent for Megacap to void the Resolutions, executing it on May 4, 2023, at which time I served Goldner my GBI Rescission Notice and a civil theft demand regarding the GBI matter.

45. **May 4, 2023: the "Threats Against Megacap."** After being served with the civil theft notice, Goldner posted a long message in the WhatsApp channel that included Little Prince and other limited partners, threatening me and the Company itself:

> You have breached your fiduciary duty and **will be removed as such for your breaches** that have put Megacap's shares at risk. You have risked the entire portfolio and **if [the TECH supplier] gets wind of this and of any perceived dispute she will most likely redeem Megacap**... The game you're playing here Eli will wind up dragging this into a Federal Court that will have a tortious discovery process that could **reveal not just people's names** [referring to the MCF Tech PortCo employee]**, but has the impact of creating a regulatory securities risk with agencies such as the SEC**... **You have continually concocted a fantasy that you have signed the agreement with Little Prince because you feel your life is in danger**.

> You should get it through your head that our financial safety and financial security are absolutely at risk because bankruptcy or threat of suit could destroy Megacap and **expose the name of the employee for TECH with the forward contract. That would be doomsday and disaster for all of us and no one would ever get paid then**... (emphasis added). (Exhibit 29)

Perplexingly, Goldner's position in those messages was that me seeking to assert my personal claims against him somehow jeopardized Megacap. This assertion reveals the depth of Goldner's inability to keep these items—which for him were "intertwined"—separate.

46. Not content with his threats against the Company, that same day, Goldner wrote to my then-fiancée over WhatsApp and admitted to making unauthorized, sexually compromising recordings of me, threatening their use unless I withdrew my legal claims: "You ever wonder if when you spoke to me I was recording you?... Do you not remember calling me when Eli was butt naked" **(**the "Sextortion," Exhibit 30).

47. **May 5, 2023: the Amended IW and the rescission of the Resolutions.** At that point, I could no longer continue working with Goldner even without him having voting authority. So, the following day, I amended the IW notice and served it upon Goldner (Exhibit 31), and Megacap executed the rescission of the February 2023 resolutions (Exhibit 32). The rescission came approximately twelve weeks after the coerced execution—and within days of Goldner's most recent unlawful acts, the April 18 Google Drive Blackmail and the May 4 Sextortion. Even then, I still did not redeem Goldner's equity, hoping that allowing him to 'rest and vest' would keep him at bay. It did not.

48. **May 12, 2023.** Goldner began improperly contacting Megacap partners almost immediately, causing me to message the Company's then-lawyer:

> I just got a call from a tertiary potential MC partner we never even closed any business with saying that Marc called both him and his partners... I need to stop Marc. I would like to get a cease and desist order and also a letter from you (Exhibit 33).

49. **May 22, 2023: the "Equity Redemption."** After it became clear that Goldner was intent on a scorched-earth campaign at any cost, his unvested equity was finally redeemed (Exhibit 34)—four months after the IW.

**G. June 2023 – October 2025: The "Scorched Earth Campaign" and the "Class B Withdrawal"**

50. **June 2, 2023: Goldner's direct solicitation of Megacap's investors against the Company**. Although he had been withdrawn as a Class A Member and Manager months earlier and held no authority to act for Megacap, Goldner began contacting the Company's limited and prospective partners directly in an effort to sabotage its fundraising. In a letter addressed to prospective limited partners, Goldner wrote that he "cannot allow you to make this potential investment" and instructed the investor: "Please do NOT wire funds to Megacap, any affiliated entities, Eli, his assigns, or any of his affiliated and/or unaffiliated entities" (Exhibit 35).

51. That same day, Goldner circulated a lengthy letter to existing limited partners, disparaging me personally, asserting that my withdrawal and redemption of his interest were "illegal, improper, and invalid," urging the limited partner to join a class action against Megacap and me, and stating that he was exploring placing Megacap into receivership with the SEC (Exhibit 36).

52. Megacap itself, by contrast, spoke only through its counsel. On the same date, the Company's then-counsel, Michael L. Elkins, wrote to Megacap's partners confirming that the Company was "operated by Dr. Eli Blatt," that "Dr. Blatt withdrew Marc Goldner as a Class A voting Member and Manager of the Company," which he had the right and ability to dispute pursuant to the MC OA's mediation-and-arbitration procedure, which Goldner had not invoked (Exhibit 37).

53. **June 7, 2023: Goldner's interference with the Company's fund administrator.** Goldner next turned to Flow, Megacap's fund administrator, personally demanding that Flow

"reinstate my full administrative privileges" and that Flow ensure there were "no outgoing subscription agreements or documents of any kind, including any tax filings being sent to anyone"—an instruction that, if followed, would have frozen the Company's operations and blocked issuance of the limited partners' K-1s (Exhibit 38).

54. **On June 26, 2023**, Goldner escalated yet again, threatening Megacap's fund administrator, Flow, with liability, demanding that Flow "require dual authorization on all documents, access, instructions, messaging, and any other actions," and asserting that "Flow can not issue any changes to K1s" (Exhibit 39).

55. Megacap again responded only through counsel. The same day, the Company's counsel, Benjamin R. Muschel, wrote Flow and reaffirmed that Goldner "was withdrawn pursuant to the terms of the Company Operating Agreement" and "is no longer authorized to speak or act on behalf of the Company"; that Goldner had not availed himself of the Operating Agreement's dispute-resolution procedures; and that, to counsel's knowledge, Goldner had "not retained counsel." Counsel asked Flow to continue working with me to finalize the Company's tax reporting, which it did (Exhibit 40). Megacap still uses Flow and in fact signed a new agreement with them executed by me after Goldner's threats.

56. **June 29, 2023: the "Scorched Earth Letter."** In a letter to me threatening to go "scorched earth" on Megacap, Goldner demanded his reinstatement and the dismissal of my lawsuit, threatening otherwise to expose the identity of the portfolio-company employee underlying MCF Tech's forward contract—which could cause the SPVs' shares to be cancelled—to involve government agencies, and to put Megacap into receivership, writing in relevant part:

> **I strongly suggest that you immediately reinstate me**, otherwise, I will be forced to not only pursue legal actions against you and third parties, but **I may have no option but to get various government and regulatory agencies involved**... **it is extremely important to remember that I possess the name (as do you) of the [Portfolio-Company] employee that is part of the [Portfolio-Company] employee forward contract**... **I**

**would highly recommend immediately dismissing this case**... Megacap will be named as a third-party defendant, and **I will most certainly ensure that ALL shares are withheld**... **I have absolutely no issue putting Megacap into receivership with the SEC** (Exhibit 41, emphasis added).

As is plainly obvious, Goldner knew he was withdrawn, which is why he demanded that he be reinstated.  This has not occurred and this admission cannot be overlooked.

57. **July 28, 2023.** Goldner's continuing interference with Megacap's partners, vendors, and limited partners caused me to seek injunctive relief in the GBI action detailing the Scorched-Earth Letter and his campaign of terror (*See* Case 1:23-cv-24819-DPG, D.E. 93).

58. **November 7, 2023: the "November 2023 Letter."** Goldner, together with Reiter and Goldner's longtime associate Simon Divilov, circulated a joint letter to Megacap's limited partners in which Goldner described Reiter—who had voluntarily withdrawn from Megacap with consideration some 18 months earlier—as "the other rightful Managing Partner of Megacap;" provided Megacap-branded email addresses for himself and Reiter that the Company never authorized; demanded limited partners take action against me; and asserted that distributions, including SpaceX shares, would not occur "without Goldner's consent, authorization, and approval" (Exhibit 42).

59. **September 2, 2025: the "Class B Withdrawal."** Realizing that Goldner ultimately could have no affiliation with the Company, even as a non-voting Class B Member, Megacap executed and tendered to Goldner a Class B Withdrawal notice. This time, the remaining Class A members opted to purchase Goldner's remaining Membership Units pursuant to the MC OA, with an express fallback provision that "[s]hould Goldner's prior redemption be deemed to have been calculated incorrectly or otherwise be overturned, his full Membership Unit count is hereby being purchased for $1 based on the anticipated $0 GAAP valuation" (Exhibit 43).

a.   The notice further provided that should Goldner object to the GAAP valuation, he could within 15 days of its receipt designate a list of five national or international audit firms for a secondary audit (*Id.*).

60. **October 20, 2025.** The Company tendered the formal GAAP audit to Goldner, which confirmed that the Company's debt structure—a structure Goldner himself had helped design as one possible Tech I financing option—produced a negative GAAP valuation. Goldner never objected, designated an auditor, or invoked the audit mechanism (Exhibit 44).

**Conclusion**

Goldner's own conduct and statements confirm his dissociation from Megacap as justified and valid. His lawful and contractually permitted removal establishes my ability to operate Megacap in service of its best interests and, by extension, the interests of its limited partners.   And I have done so, diligently. For three years, I am the only one that has acted affirmatively on behalf of Megacap. I sign tax returns, reconcile bank accounts, keep tabs on those action items that encompass day-to-day operations of the company, communicate with limited partners, subscribe new limited partners, and assert the Company's rights through litigation where necessary.   By contrast, Goldner has done none of these things since his removal. In fact, the opposite. Everything Goldner has done—while asserting to be a member—has been to the detriment of the company, including his effort to intervene in the instant case, which risks grinding it to a halt to the detriment of Megacap and its limited partners. Goldner's claims to being a member are thus irreconcilable with his actions.

I declare under penalty of perjury that the foregoing representations and incorporated exhibits are true and correct to the best of my knowledge and recollection. Executed on this 17th day of June, 2026

_____
Eli M. Blatt